HENRIE v HENDERSON et al.

(Circuit Court of Appeals, Fourth Circuit. May 1, 1906.)

No. 645.

1. APPEAL—JURISDICTION—CONSENT.

The fact that neither party objected to the jurisdiction of the federal court at the trial was insufficient to justify the circuit court of appeals in assuming jurisdiction to determine the controversy, unless the record affirmatively showed that the case presented was within the class of cases of which jurisdiction has been conferred on the federal courts.

2. BANKRUPTCY—ADMINISTRATION OF ESTATE—SALE OF REAL ESTATE—CONTRACTS—SPECIFIC PERFORMANCE—JURISDICTION.

Where a sale of a bankrupt's lands had been confirmed in the purchaser, and he had paid the purchase price for the same prior to any controversy

concerning his right to a deed, the court of bankruptcy had neither ancillary nor original jurisdiction of a proceeding by petitioner to restrain the trustee from making a deed to the purchaser, and to compel the execution of a deed by the trustee for a portion of the property to petitioner, to compel specific performance of an alleged contract relating to the sale of the land between the petitioner and the purchaser.

Petition for Revision of Proceedings of the District Court of the United States for the Northern District of West Virginia.

For opinion below, see 142 Fed. 568.

J. C. McCluer (McCluer & McCluer, on the brief), for petitioner.
V. B. Archer, for respondents.

Before PRITCHARD, Circuit Judge, and PURNELL and McDOWELL, District Judges.

PRITCHARD, Circuit Judge. In the latter part of the year 1904, H. C. Henderson filed his petition in bankruptcy in the District Court of the United States for the Northern District of West Virginia, and was duly adjudged a bankrupt. He was the owner of considerable real estate lying in the county of Wood and state of West Virginia, near the Ohio river, in Williamston district. This land constituted the principal part of his assets, which amounted to about $75,000, and his liabilities were about the same amount. By direction of the court, this land, which was considered very valuable on account of its location and quality, was divided into lots of from 20 to 40 acres each. Lots Nos. 1, 2, and 3 lay adjacent to each other on the line of the Ohio River Railroad, and also the Interurban Electric Line, leading from Parkersburg, in West Virginia, to Marietta, in the state of Ohio. The Union Trust & Deposit Company was appointed trustee in the bankruptcy proceedings of H. C. Henderson, and caused all the lands to be advertised for sale on the 24th of May, 1905. Some lots lying in the town of Williamston belonging to the bankrupt estate were sold on that day, and at this sale James Henrie, petitioner, was a bidder, as was also J. B. Henderson, a brother of H. C. Henderson, the bankrupt. When the sale of these Williamston lots was concluded, J. B. Henderson approached the petitioner, James Henrie, and stated to him, as appears from the evidence as follows:

"I understand, Mr. Henrie, that you intend to buy some of the land down near our home, which will be sold this afternoon, and which has been laid off as lots Nos. 1, 2, and 3."

Mr. Henrie replied that he did intend to bid on it, and if it did not go too high that he would buy it. J. B. Henderson then stated:

"I would like to have that part that lies between the Interurban Railway and the Ohio River Railroad, and if you buy it, and will let me have it, I will not bid against you."

Mr. Henrie replied, "All right, I intend to buy it if it does not go too high." There is a contradiction of evidence about this transaction. J. B. Henderson states that he (Henderson) told Henrie that he was to bid until Henrie would direct him to stop bidding. However, there was some agreement between them, according to the evidence of

both Henrie and J. B. Henderson, that if Henrie bought this land he would let J. B. Henderson have the part that lay between the Interurban Electric Road and the Ohio River Railroad Company's property, and would make him a deed for the same. J. B. Henderson claims that Henrie was to let him have the land at the pro rata price per acre that he would pay for the entire tract. On the other hand, Henrie claims there was nothing said about the price. When the sale was made, these three lots, Nos. 1, 2, and 3, were offered as a whole as advertised, and the 60 acres were bought by Henrie at the price of $5,290. During the time the auctioneer was offering said lands as a whole for sale, Henrie was bidding on same lands, and J. B. Henderson was also bidding. J. B. Henderson states, as appears from the commissioner's report and from the evidence, that J. B. Henderson sent his brother to Mr. Henrie to know when he should stop bidding. Mr. Henrie, the petitioner, in his testimony, says he did come and ask the question, but that he (Henrie) made no reply to the question; that he was surprised at Henderson's bidding after making the proposition to him that he would not bid against him if he (Henrie) would let him have the part of the land indicated, and therefore he made no reply whatsoever to the brother of J. B. Henderson.

After it was announced that James Henrie was the purchaser of the land in question, it was then offered, in pursuance to the advertisement, separately by lots. The petitioner, Henrie, did not bid on these lots separately, but J. B. Henderson did. On two of the lots J. B. Henderson was the highest bidder, and the auctioneer declared him the purchaser of the same. When aggregating the amounts for which the lots separately had been sold, it was ascertained that it was not as much as Henrie had bid for the whole, and the auctioneer then announced that the three lots, Nos. 1, 2, and 3, were sold to James Henrie. Immediately after the sale, James Henrie, the petitioner, not desiring to give his notes for deferred installments of the purchase money, as advertised, and pay interest thereon, stated to the attorney for the trustee that he would pay the entire amount of the purchase money. J. B. Henderson stated that he would give his check for the land that Henrie had agreed he should have if he knew the quantity of the land, but he did not know the quantity, and proposed that his brother, H. C. Henderson, the bankrupt, and Morgan Henrie would some time lay it off. Henrie, the petitioner, stated that he was very busy at the time, and that they could attend to that at any time. After the land had been sold and the sale confirmed and the purchase money paid, J. B. Henderson instituted proceedings in the bankruptcy court to restrain the trustee in bankruptcy from making a deed to James Henrie for the property sold at the trustee's sale and purchased by Henrie, and also prayed for a decree to compel the trustee to make a deed to the said J. B. Henderson for certain portions of the land sold.

It does not appear from an inspection of the record that any motion was made to dismiss the proceeding in the lower court for want of jurisdiction. There is nothing to indicate that either party attempted to raise this question. Nevertheless, it has been held that, where neither party objects to the jurisdiction of the court below,

the consent of parties does not give the courts of the United States jurisdiction, unless the case presented is such as to bring it within that class of cases where jurisdiction has been conferred by the Constitution and laws.

In the case of Cutler v. Wm. A. Rae, 7 How. 730, 12 L. Ed. 890, Chief Justice Taney, in rendering the opinion of the court, says:

"Upon the face of the proceedings, therefore, the question arises whether the District Court had jurisdiction as a court of admiralty to try the matter in dispute. It is unnecessary to state more fully the pleadings and testimony until this question is disposed of. It is true the counsel for the appellant has waived all objections on that score. But the consent of parties cannot give jurisdiction to the courts of the United States in cases where it has not been conferred by the Constitution and laws, and if the proceedings show a case which the District Court was not authorized to try, it is the duty of this court to take notice of the want of jurisdiction, without waiting for an objection from either party."

Also, in the case of Mills v. Brown, 16 Pet. 525, 10 L. Ed. 1055, Chief Justice Taney, among other things, said:

"It is true the plaintiffs and defendants have both waived all objection to jurisdiction, and have pressed the court for a decision on the principal points. But consent will not give jurisdiction. And we have therefore on several occasions said that, when the act of Congress has so carefully and cautiously restricted the jurisdiction conferred upon this court over the judgments and decrees of the state tribunals, it would ill-become the court to exercise it in a different spirit, and it certainly could not be justified in expressing an opinion favorable or unfavorable as to the correctness of this decree when it has not the power to affirm or reverse it."

Even though it appears that the petitioner did not object to the federal court taking jurisdiction of this case, this court would of its own motion refuse to entertain jurisdiction of the parties if it does not affirmatively appear in the record that the court below had jurisdiction. In order to give the court jurisdiction, the record must show upon its face that this is a controversy between citizens of different states, and that the matter in dispute exceeds, exclusive of cost and interest, the sum of $2,000; and, inasmuch as there is nothing in the record which shows affirmatively that the controversy is between citizens of different states, and that the jurisdictional amount is involved, this court must of its own motion refuse to consider this proceeding for want of jurisdiction in the lower court.

This is not a case in bankruptcy in any sense of the word. It is not contended that either the plaintiff or defendant were parties to the proceeding before the referee in bankruptcy. It appears that proceedings were instituted in the bankruptcy court by J. B. Henderson to restrain the trustee in bankruptcy from making a deed to James Henrie for property sold at a trustee's sale in bankruptcy and purchased by Henrie, and also demanding a decree commanding the trustee to make a deed to the said J. B. Henderson for a certain portion of the lands that were sold. An inspection of the record discloses the fact that, before any controversy arose between the parties, the sale of the lands had been confirmed, and Henrie had paid the purchase price for the same. Henderson's contention is that a portion of the land purchased by Henrie should be conveyed to him, in ac-

cordance with a verbal agreement which he alleges was entered into prior to the sale of the lands by the trustee. Thus it will be seen that this is a controversy between two parties, neither of whom was a party to the proceeding in bankruptcy under which the property was sold. It is a controversy which does not in the slightest degree affect the creditors of J. B. Henderson, the bankrupt, nor is the trustee in any wise affected. Stripped of all extraneous matters, it appears to be an effort on the part of Henderson to compel specific performance of a contract relating to the sale of land. There is no provision which gives the bankruptcy court jurisdiction to hear and determine controversies of this kind. The object of the bankruptcy law is to afford the means by which the creditors of the bankrupt may secure an equitable and fair distribution of the bankrupt's property, etc., and the act contemplates that any collateral questions growing out of the settlement of the bankrupt's estate may be heard and determined in that court. But here we have parties who are contending about a matter which is in no way related to or connected with the affairs of the bankrupt. Under these circumstances, we fail to understand the theory on which this proceeding was instituted.

It is insisted that the court below had ancillary jurisdiction to the extent of restraining the trustee from making a deed for the property in question until the respondent could assert his rights in the proper forum. This position is untenable, because the court was without jurisdiction in the first instance; therefore there was nothing on which to base ancillary jurisdiction.

In the case of Raphael v. Trask, 194 U. S. 277, 24 Sup. Ct. 647, 48 L. Ed. 973, Justice Day, who delivered the opinion, among other things said:

"We had occasion to consider the nature of ancillary bills in the late case of Julian v. Central Trust Co., decided at this term, 193 U. S. 93, 24 Sup. Ct. 399, 48 L. Ed. 629, and we are unable to find any precedent in the reported cases or text-books which will maintain this bill in that aspect. Ancillary bills are ordinarily maintained in the same court as the original bill is filed, with a view to protecting the rights adjudicated by the court in reference to the subject-matter of the litigation, and in aid of the jurisdiction of the court, with the purpose of carrying out its decree, and rendering effectual rights to be secured or already adjudicated. Story Eq. Pl. (8th Ed.) § 326, et seq.; Root v. Woolworth, 150 U. S. 401, 411, 14 Sup. Ct. 136, 37 L. Ed. 1123; Bates Fed. Eq. Procedure, vol. 1, § 97."

It is well settled that courts cannot exercise ancillary jurisdiction in cases wherein they do not possess jurisdiction in the first instance. Ancillary jurisdiction presupposes primary jurisdiction, and can only be invoked in aid of the same.

We are of the opinion that the court of bankruptcy has no jurisdiction of suits of this character, but, even if this were an effort on the part of the respondent to bring his suit in the Circuit Court of the United States, that court would be without jurisdiction, inasmuch as it appears from the record that both parties are citizens and residents of the state of West Virginia. We are therefore of opinion that the District Court was without jurisdiction to hear and determine the controversy between the petitioner and respondent. The case will be remanded, with instructions to dismiss this suit.